Pendleton, President,
delivered the resolution of the ' court as Iollows :
In 1760, Nathaniel Chapman, a wealthy man, died in Maryland, intestate, whether from accident or design, does not appear, nor is it material, since it does not appear, that he was prevented from making a will by fraud or accident. It is fortunate for his younger children, that on a general view of his slaves and personal estate, none of them were left without a comfortable provision.
He left a widow, who, besides her legal interest in his estate, possessed, in her own right, lands and slaves of considerable value.
He had three sons, Nathaniel, Pearson and George, and several daughters, of whom we have no account; nor do they appear concerned.
Nathaniel the heir succeeded to all the lands of the father in Maryland and Virginia, which were very valuable; and he dying soon after, intestate and without issue, the inheritance devolved upon Pearson, the next brother; who frequently declared his intention to let his brother George have part of his father’s lands; but the quantity, or specific land, was never ascertained, in those conversations.
In 1766, the mother having the same inclination that her favourite younger son should enjoy part of his father’s lands, presses Pearson to a specific donation: when he may be supposed to have reasoned thus, I am willing to let my brother into a share of my father’s lands, but, having done so, and put it out of my power to recall it, you, madam, who are wealthy, may give all your estate to him, and place me in the same state of inequality, in which he now is, with respect to my father’s lands: but, if you will promise to give me half your estate at your death, or an equal part with George, which meant the same thing (the daughters don’t appear to have been in the contemplation of either), I will convey him certain estates. Was there any thing so unreasonable in this proposition, as to vitiate the mutual contract, which followed upon it ? She accepted of the pro *439 posai, and promised to do what he required; which must be considered as the consideration for what he was to do, on his part. Relying on a mother’s promises, (what son would not), he proceeds to execute three deeds in Alexandria, one for a tract of land in Fairfax; a second for two lots in Alexandria, which were acknowledged in that court immediately, and recorded, by which the plaintiff derived from his brother’s bounty, as the case turned out, property estimated at £ 3300. The third deed for the Pignut land, which lay in Fauquier, was to be recorded there, and was sent thither for the purpose : but no proof was in fact made; for, on the discovery that only two witnesses had subscribed, it was returned to the mother to be perfected. She trusted it with Pearson, who refused to' perfect it; keeping it in suspense; and continually declaring he was willing to make the deed upon being secured of the performance of his mother’s promise; until, by conveying her lands to the plaintiff, she put it out of her power to perform it, and then probably he destroyed it.
The parties, that is, the mother and Pearson both seem to have considered the claim of George, to the Pignut land, as then at an end; for Pearson, in his will in 1771, devises this land to his son George as his only land provision, except a lot in Fredericksburg; and the mother conveyed all her lands to the plaintiff, declaring she did so, to make him amends for the loss of the Pignut land : thus making herself the chancellor on the occasion. If that compensation was inadequate, she supplied the deficiency in her will, by devising him all her estate, except fifteen guineas to a grand son Weams, and a guinea, for a ring, to a Miss Harrison.
And, now, it is asked, in a court of equity, to take from the defendant this land, his only provision in land, and give it to the plaintiff; who, claiming under his mother’s contract, is bound by her breach of it; and who has received, from her, compensation for this land, besides what he got from his brother, before the breach was discovered.
*440 In this view, the plaintiff’s scale of equity certainly kicks the beam ; nor will it be brought to repoise by the maxim, “ He that has committed iniquity shall not have equity,” his suppression of the deed not proceeding from a fraudulent purpose, but as a justifiable guard against fraud and injustice meditated against him.
The proof of the contract was so full and strong, that the only doubt the chancellor could have, must have arisen from the credit of the witnesses having been assailed, and the contradi dory deposition of the mother: He therefore properly directs an issue to be tried by a jury, the proper judges of their credibility. The verdict puts an end to all objection on that head, and to the question of fact, “ Whether the mother’s promise was made, and was the consideration for Pearson's intended donations ?” And this court, as well as the chancellor, are satisfied with the verdict.
They are also satisfied with his having overruled the motion for a new trial. If the plaintiff, discovering the deposition to be lost, had moved for a continuance; or if supposing it there, he had gone to trial, called for it, and discovered it was lost, there would have been some reason for a new trial; but it never having been called for during the trial, they must have judged it at least immaterial, and the same, as if not taken : like a witness summoned and attending, but not called on; which would not be a reason for a new trial. The court therefore unanimously affirm the judgment.